```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
_____

MAURICE HAWKINS,

                        Petitioner,

      -vs-                                **No. 1:12-CV-0643(MAT)**
                                                  **DECISION AND ORDER**
H.D. GRAHAM, Superintendent, Auburn
Correctional Facility,

                        Respondent.
_____

**I.   Introduction**

Pro se petitioner Maurice A. Hawkins ("Hawkins" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on the basis that he is being held in Respondent's custody in violation of his federal constitutional rights. Hawkins is incarcerated following judgment entered against him on August 24, 2007, in New York State Supreme Court, Monroe County, following a jury verdict convicting him of Attempted Murder in the Second Degree (New York Penal Law ("P.L.") §§ 110.00, 125.25(1)), Assault in the First Degree (P.L. § 120.10(1)), and Burglary in the First Degree (P.L. § 140.30(1), (2), (4)). Hawkins is serving an aggregate sentence of 25 years, plus five years of post-release supervision.

**II.  Factual Background and Procedural History**

On October 13, 2006, Petitioner entered a two-story apartment in Rochester, New York, occupied by 16-year-old Tyshon Maddox, his brothers Antwon Maddox ("Antwon") and Draquan Maddox, and his

grandmother, Sharon Yancey ("Yancey"). The three brothers each had their own bedroom on the second floor, while Yancey slept downstairs in the living room. It was at about 2:30 in the morning when Antwon, who was playing a video game in his room, heard someone bang on the front door; enter the apartment; and run upstairs. Antwon then heard three gunshots.

Tyshon was asleep in his bed when he heard and felt a gunshot. He looked down and saw blood and a "big hole" in his chest. He tried to get up but could not. Although the lights were off in Tyshon's bedroom, there was some illumination from the hallway light. Tyshon was able to see Petitioner, whom he knew by his street name of "Green Eyes," standing next to his bed, wearing a red hooded sweatshirt and holding what he described as a "shotgun." Tyshon saw Petitioner's face as he backpedaled out of the bedroom.

Antwon ran to his bedroom window in an attempt to escape. Straddling the window-sill, Antwonn observed a tall black male leaving through the front door, wearing a red-hooded sweatshirt and holding what appeared to be a shotgun. Antwon recognized him as the individual he knew as "Green Eyes".

Tyshon was unresponsive by the time police arrived. Antwon told Rochester Police Department Officer René Cruz ("Officer Cruz") that someone broke into the apartment and shot Tyshon. However, Antwon did not tell Officer Cruz that he knew who the shooter was, and Officer Cruz did not ask him if he knew the shooter's identity.

Fearful of retaliation, Antwon did not inform the police that Petitioner (a/k/a "Green Eyes") was the shooter until three days after the incident. By that time, Antwon had moved out of the neighborhood.

The day after the shooting, Rufodina Ware, who lived in the same neighborhood as the Maddox brothers, saw Petitioner in a parking lot near the apartment complex, wearing jeans and a red hooded sweatshirt.

Eric Freemesser, a firearms examiner with the Monroe County Public Safety Laboratory, testified that he examined two .30 caliber rifle cartridges recovered from Tyshon's bedroom, and concluded that they were ejected from a semiautomatic rifle.

Following Antwon's testimony, defense counsel informed the trial court that should the prosecutor not call Tyshon's grandmother, Yancey, he would request a missing witness jury instruction because she was present at the apartment on the night of the shooting. Yancey had failed to identify Hawkins from a photo array and had described the shooter as about five feet, seven inches tall, while Hawkins in fact was about six feet, five inches tall. The assistant district attorney argued against the instruction, noting that Yancey could not make a positive identification and therefore her testimony was not favorable to the prosecution. He also argued that Yancey's testimony would be

cumulative to that offered by Tyshon and his brother, save for her estimation of the shooter's height as 5'7".

Defense counsel argued that Yancey's testimony would not be cumulative because it substantially contradicted the testimony of both boys with regard to their description of the shooter's height.[1] Defense counsel further urged that the prosecutor had misinterpreted the prerequisites of a missing witness charge as laid out in People v. Gonzalez, 68 N.Y.2d 424 (1986),[2] specifically, the "control" element. According to defense counsel, Gonzalez "talks about the position of the witness being in such a position that it would be anticipated that their testimony would be favorable[,]" i.e., that they "were not in a position to have a bias or interest or hostility contrary to the People. . . ." Defense counsel conceded that Yancey's testimony would not be favorable to the prosecution, but argued that due to her relationship to Tyshon (as his caretaker and grandmother), it was

---

[1] Antwon described the shooter as approximately six feet three inches or six feet four inches tall, while Tyshon simply described the shooter as "tall," without estimating his height.

[2] "The burden, in the first instance, is upon the party seeking the charge to promptly notify the court that there is an uncalled witness believed to be knowledgeable about a material issue pending in the case, that such witness can be expected to testify favorably to the opposing party and that such party has failed to call him to testify." Gonzalez, 68 N.Y.2d at 427. The opposing party can meet its burden by "demonstrating that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not 'available', or that the witness is not under the party's 'control' such that he would not be expected to testify in his or her favor." Id. at 428.

inconceivable that one would anticipate her providing testimony unfavorable to the prosecution.

The trial court declined to give the instruction, finding that Yancey's testimony would be cumulative and not favorable to the prosecution. The trial court further stated that because the prosecution had provided reports containing Yancey's statements to the police, Yancey was available to testify for the defense. The trial court stated that he would afford defense counsel the opportunity to comment extensively in his summation about the prosecution's failure to call Yancey.

During his cross-examination of the prosecution's witnesses, trial counsel appeared to pursue a defense theory that the trial court characterized as follows: Tyshon and Antwon identified Petitioner as the shooter because they believed that Petitioner was associated with Rasheem Gayden ("Gayden"), who shot and killed the Maddox brother's half-brother, Andre Knox ("Knox"), on September 15, 2006, and who also threatened their father, André Maddox ("André"), approximately one week before the incident. Both Antwon and Tyshon testified on cross-examination that Gayden was involved in the death of Knox, and that Gayden and André had argued about this in early October of 2006. During that argument, Gayden threatened André. Antwon testified that he believed that Petitioner was an associate of Gayden's because Antwon had seen Petitioner and Gayden together prior to October 13, 2006.

Hawkins' trial attorney also called several witnesses for the defense. On the morning of the shooting, RPD Investigator Nicolas Mazzola ("Inv. Mazzola") spoke with Antwon in a police car in the apartment complex's parking lot. Antwon described the shooter only as a male black wearing a red hooded sweatshirt. Inv. Mazzola did not ask Antwon if he could identify the shooter, and Antwon did not state that he could. Later that day, RPD Officer Theresa Dearcop ("Officer Dearcop") spoke with Antwon. In response to her questions, Antwon described the shooter as a tall black male with a medium build, who was wearing a red hooded sweatshirt with the hood pulled up. When Officer Dearcop asked Antwon if he had seen the shooter's face, he replied that he had not, and that he could not identify the shooter.

About a month after the shooting, Inv. Mazzola learned that Tyshon was able to speak, so he paid him a visit to question him about the incident. Inv. Mazzola asked Tyshon if he could identify the person who shot him, and Tyshon replied that he could not.

The defense also called Warees Yancey ("Warees"), who was Yancey's son, the Maddox brothers' uncle, and Knox's uncle. As noted above, Knox was the Maddox brothers' half-brother, who was killed on September 15, 2006. On the afternoon of October 13, 2006, Warees saw Petitioner, wearing blue jeans and a red hooded sweatshirt, in the parking lot near the apartment complex where the Maddox brothers and their grandmother resided. Upon seeing

Petitioner, Warees departed and told André, the Maddox brothers' father, that Petitioner was in the parking lot. Warees also described Petitioner's apparel to André.

On May 4, 2007, the jury returned a verdict finding Petitioner guilty as charged in the indictment. On August 24, 2007, the trial court sentenced him to determinate, concurrent terms of imprisonment of 25 years on each conviction, to be followed by five years of post-release supervision.

On his direct appeal, Hawkins filed a counseled brief in the Appellate Division, Fourth Department, of New York State Supreme Court, raising one claim: that the trial court improperly denied his request for a missing witness jury charge based on the prosecution's failure to call Yancey as a witness. On May 6, 2011, the Appellate Division unanimously affirmed the conviction. People v. Hawkins, 84 A.D.3d 1736 (4th Dep't 2011). Even assuming arguendo that Hawkins met his initial burden of showing that Yancey "would be knowledgeable concerning a material issue at trial and would be expected to provide testimony that would be favorable to the [prosecution]," the Appellate Division concluded that the prosecution had met its burden of establishing that a missing witness charge "would not be appropriate." Hawkins, 84 A.D.3d at 1737 (citation omitted). In particular, the Appellate Division found, "[t]he prosecutor established that the missing witness would have provided certain testimony that was cumulative to that of

other witnesses, and that the witness otherwise would not be expected to provide testimony that was favorable to the [prosecution]'s case." Id. (citations omitted). On July 27, 2011, the New York Court of Appeals denied leave to appeal. People v. Hawkins, 17 N.Y.3d 806 (2011).

In his timely-filed habeas petition, Hawkins raises the same claim that he raised on direct appeal. Respondent answered the petition, arguing that the claim is unexhausted but procedurally defaulted and, in any event, without merit. Hawkins filed a reply brief, apparently conceding that the claim is unexhausted but arguing that the procedural default should be excused.

For the reasons discussed below, the request for a writ of habeas corpus is denied, and the petition is dismissed.

**III. Exhaustion**

    **A.   General Legal Principles**

"[B]efore a federal court can consider a habeas application brought by a state prisoner, the habeas applicant must exhaust all of his state remedies." Caravajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) (citing 28 U.S.C. § 2254(b)(1)(A)). "In order to satisfy the exhaustion requirement of federal habeas, a petitioner must have 'fairly presented' the federal constitutional nature of a claim to the state courts." Reid v. Senkowski, 961 F.2d 374, 376 (2d Cir. 1992) (per curiam) (quoting Gonzalez v. Sullivan, 934 F.2d

419, 422 (2d Cir. 1991); Daye v. Attorney General of the State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (in banc)).

A state prisoner is not required to cite "chapter and verse of the Constitution" in order to satisfy this requirement, Daye, 696 F.2d at 194, but he must express his habeas claim in terms that are "likely to alert the [state] court[s] to the claim's federal nature." Lurie v. Wittner, 228 F.3d 113, 124 (2d Cir. 2000) (quoting Daye, 696 F.2d at 192). A habeas petitioner may satisfy the "fair presentment" requirement by relying on "pertinent federal cases employing constitutional analysis"; relying on "state cases employing constitutional analysis in like fact situations"; asserting the claim "in terms so particular as to call to mind a specific right protected by the Constitution"; or alleging "a pattern of facts that is well within the mainstream of constitutional litigation." Daye, 696 F.2d at 194; accord, e.g., Caravajal, 633 F.3d at 104.

When a habeas petitioner fails to adequately present his federal claim to the state courts and faces a state procedural bar were he to attempt to return to state court and re-present the claim, the federal court must deem the claim exhausted but procedurally defaulted. Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) (noting that the "apparent salve" of deeming a claim not presented in state court exhausted is "cold comfort" to the petitioner). A petitioner may overcome the procedural default that

arises in this situation by demonstrating cause for the default and prejudice resulting therefrom, or by showing that a fundamental miscarriage of justice would occur should the federal court decline to hear his habeas claim on the merits. E.g., Coleman v. Thompson, 501 U.S. 722, 748-49 (1991).

**B.   Analysis**

Respondent argues that Petitioner has failed to exhaust his "missing witness" jury charge claim because he did not fairly present the claim in federal constitutional terms to the New York State courts. As Respondent points out, Petitioner raised this claim in his Appellate Division brief, but he cited only state law cases in support. See Respondent's Exhibit A ("Resp't Ex. A at i (Table of Authorities); 13-18 (Point I)). Petitioner argued solely that the trial court had not properly applied the state law standards regarding the issuance of "missing witness" jury charges as set forth in People v. Gonzalez, 68 N.Y.2d 424, supra. Petitioner did not cite any amendments or provisions of the United States Constitution, and he did not reference federal constitutional principles such as "denial of due process" or "denial of the right to a fundamentally fair trial". Cf. Reid v. Senkowski, 961 F.2d at 376 (finding that habeas petitioner fairly presented "missing witness" charge claim by framing the issue in his state-court appellate brief as "[w]hether appellant's right to due process of law was violated by the trial court's refusal" to

provide a missing witness jury charge requested by defense counsel; also, in the point-heading which set forth his argument on the missing witness charge, petitioner cited to the Fourteenth Amendment of the United States Constitution) (citing Gonzalez v. Sullivan, 934 F.2d 419, 423 (2d Cir. 1991); Daye, 696 F.2d at 192 (stating that "if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state courts")). In Hawkins' leave application to the Court of Appeals, he again presented the missing witness instruction claim solely as a violation of state law. See Resp't Ex. D at 3-5. The Court thus agrees with Respondent that the claim is unexhausted because Petitioner failed to sufficiently notify the state courts of the claim's federal constitutional nature.

Because the "missing witness" jury instruction claim concerns a ruling by the trial court, it clearly is record-based and could have been raised on direct appeal. For this reason, Petitioner is now barred from raising it in a collateral motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in state court. See N.Y. CRIM. PROC. LAW § 440.10(2)(c) (mandating that the trial court "must" deny any issue raised in a C.P.L. § 440.10 motion where the defendant unjustifiably failed to argue such violation on direct appeal despite a sufficient record to do so); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001)

("New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal.") (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)).

Petitioner cannot pursue a second direct appeal, for under New York State law, a criminal defendant is only entitled to one appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals. See N.Y. CT. RULES § 500.20(a)(2) providing that application for leave to appeal to the New York Court of Appeals in a criminal case pursuant to New York Criminal Procedure Law § 460.20 must include statement that "no application for the same relief has been addressed to a justice of the Appellate Division, as only one application is available"); N.Y. CRIM. PROC. LAW § 450.10(1); see also N.Y. CT. RULES 500.20(d) ("A request for reargument or reconsideration shall not be based on the assertion for the first time of new points, except for extraordinary and compelling reasons.").

As Petitioner has no further recourse in state court, his unexhausted claim should be deemed exhausted. See, e.g., Reyes v. Keane, 118 F.3d 136, 139 (2d Cir.1997) ("Reyes' claim should be deemed exhausted because any attempt at exhaustion in the face of this procedural default would be futile."). The foregoing procedural bar to presentment in state court, which causes the Court to deem the claim exhausted, also renders it procedurally

defaulted. Id. ("Although Petitioner's claim of ineffective assistance is deemed exhausted, we nonetheless find that, by defaulting on that claim in state court, Reyes forfeits that claim on federal habeas review, even though the claim is brought as cause for another procedural default.") (citing Gray v. Netherland, 518 U.S. 152, 162 (1996)).

Petitioner asserts that he has demonstrated "cause" for the procedural default because his appellate counsel was ineffective in failing to "federalize" his "missing witness" jury instruction claim. See Petitioner's Reply ("Reply") at 2. He contends that he has shown "prejudice" because appellate counsel's failure to "federalize" his claim has resulted in a procedural default before this Court. Id. Petitioner also asserts that a fundamental miscarriage of justice will occur if this Court does not hear his claim because he is "innocent" of the charges of which he was convicted. Id. at 3.

The Supreme Court has acknowledged that in certain circumstances counsel's ineffectiveness will suffice to show "cause" to excuse a procedural default. Edwards v. Edwards v. Carpenter, 529 U.S. 446, 451–53 (2000) (citing Murray v. Carrier, 477 U.S. 478, 488-89 (1986)). However, the Supreme Court has clarified, "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." Id. (citing Carrier, 477 U.S.

-13-

at 489; internal citation omitted). Moreover, the ineffective assistance claim sought to be used as "cause" must first be raised in state court and fully exhausted. Edwards, 529 U.S. at 451-52 (citing Carrier, 477 U.S. at 489 ("[A] claim of ineffective assistance" generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."); 28 U.S.C. § 2254(b), (c)).

Here, Petitioner never raised any claims of ineffective assistance of trial or appellate counsel in state court. Thus, he does not have a meritorious, exhausted ineffective assistance claim that potentially could serve as "cause" for the procedural default. Because Petitioner has failed to establish "cause", the Court need not determine whether he has shown "prejudice".

Turning to the fundamental miscarriage of justice exception, the Supreme Court has limited its availability to "'extraordinary case[s], where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012) (quoting Carrier, 477 U.S. 478; alteration in Rivas)). To qualify for the fundamental miscarriage of justice exception, the petitioner must have a claim of actual innocence that is both "credible" and "compelling." Id. at 541 (quoting House v. Bell, 547 U.S. 518, 521, 538 (2006)). Hawkins' conclusory and unsupported assertion that he is innocent plainly does not come close to meeting this demanding standard. See id.

(noting that a petitioner attempting to show "actual innocence" must, inter alia, come forward with new, reliable evidence that was not presented at trial) (citing House, 547 U.S. at 537, 538; other citation omitted).

In sum, the Court finds no basis to excuse the procedural default of Hawkins' "missing witness" jury instruction claim. Accordingly, federal habeas relief on the claim is precluded.

**IV. Conclusion**

The application for a writ of habeas corpus is denied, and the petition is dismissed. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

**SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   January 29, 2014
         Rochester, New York